# Supreme Court of Florida

_____

No. SC13-921
_____

**THE FLORIDA BAR,**
Complainant,

vs.

**ZANA HOLLEY DUPEE,**
Respondent.

[March 26, 2015]

PER CURIAM.

We have for review a referee's report recommending that Respondent Zana Holley Dupee be found guilty of professional misconduct and be suspended from the practice of law for ninety days followed by two years' probation. We have jurisdiction. See art. V, § 15, Fla. Const. Due to the serious nature of the misconduct, we find that more severe discipline is required and suspend Respondent from the practice of law for one year.

## FACTS

The Florida Bar filed a complaint against Respondent alleging multiple counts of professional misconduct. The Court referred the complaint to a referee,

who conducted disciplinary proceedings including an evidentiary hearing and submitted a report including findings of fact, recommendations as to guilt, and recommendations as to discipline.

**The Referee's Findings of Fact**

The referee made the following findings of fact. Respondent represented the wife in a dissolution of marriage action filed by the client's husband in July 2010. Respondent's client had a credit union account in her name only with over $480,000 in it. After the dissolution action was filed and after meeting with Respondent to discuss representation, the client withdrew the money in the account, closed the account, and had the credit union issue a cashier's check in the amount of $482,980.46, payable to "Parenting Education Charitable Trust." Respondent had suggested the name to use on the check, became aware of the existence of the check shortly after its issuance, and knew that no charitable trust by that name existed. This check was never negotiated and remained in the client's possession for the next eleven months, until she redeposited it into a new account at the same credit union and then moved it to an already existing account at a bank. Because the named payee was fictitious and the check was never negotiated, the money represented by the cashier's check remained the property of Respondent's client. See § 673.4041(2), Fla. Stat. (2014).

In late August and early September 2010, respectively, the husband's attorney served on Respondent a request for production and standard family law interrogatories. Respondent did not provide timely responses to these discovery requests. The husband's counsel filed a motion to compel, which the trial court granted. In December 2010, Respondent served answers to the standard family law interrogatories and a written response to the husband's request for production. She also filed a family law financial affidavit signed by the wife. The only cash asset listed in the financial affidavit as being in the wife's name only was a checking account containing $16,285.40. The affidavit did not mention the cashier's check then in the wife's possession. The affidavit was therefore false and Respondent submitted it to the court knowing that it was false.

In the wife's answers to the standard family law interrogatories, under the category "assets," subcategory "intangible personal property" (item 4c), the answer stated, "No items other than the financial account listed in the Wife's Financial Affidavit." By stating that the wife's only intangible personal property was the account listed in the affidavit, the answer Respondent served on behalf of the wife was false and Respondent knew it was false. Item 4e called for disclosure of "financial accounts," and the answer read, "These are listed in the Wife's Financial Affidavit. Copies of statements are also included in the documents being produced in response to Husband's Request to Produce." Item 4f called for "closed financial

accounts." The answer read, "Copies of statements are included in the documents being produced in response to Husband's Request to Produce." The answers to items 4e and 4f were incomplete and misleading. Florida Rule of Civil Procedure 1.340, Interrogatories to Parties, provides that interrogatory answers that refer to other records must be "in sufficient detail to permit the interrogating party to locate and to identify, as readily as can the party interrogated, the records from which the answer may be derived or ascertained." Respondent knowingly failed to provide truthful and complete disclosure of material information sought in discovery.

The request to produce, in item 6, asked for banking information for the previous four years in three categories, "accounts," "records," and "checks and money orders." The request specified the husband's attorney's office as the place of production. The response served by Respondent on behalf of the wife stated, "The following disclosures and documents as set out below are available for inspection and copying at the office of the undersigned." The responses to items 6a and 6b, which requested bank account information and records, stated that bank account records, including those for the previously mentioned credit union account, were "available for inspection and copying at the office of the undersigned." No response was provided for item 6c, which requested "all cashier's checks, money orders, or certified checks, in your possession or under your control."

Although the husband's request to produce specified the husband's counsel's office as the place of production and the husband's motion to compel compliance had been granted in December 2010, Respondent did not produce the requested items until September and October of 2011. Respondent did not object to the specified place of production or seek a protective order. Under Florida Family Law Rule of Procedure 12.285, Mandatory Disclosure, Respondent was required to produce the requested documents, including the cashier's check. She knowingly failed or refused to produce documents in response to the request for production.

While the dissolution proceeding was pending, Respondent submitted to counsel for the husband a proposed settlement agreement. The proposal included dispositions of various items and categories of the parties' assets and provided that the wife would receive all funds in accounts held solely in her name. This proposal was delivered at a time when Respondent's client still held the undisclosed cashier's check in an amount exceeding $480,000.

On September 9, 2011, the husband's attorney took the wife's deposition. Respondent was present. Knowing that some years earlier, the husband had transferred $100,000 to the wife as a conciliation following some marital discord, the husband's attorney asked her if she still had that money. The questioning brought out testimony that the wife had withdrawn the money from the account where she had it, along with other money in the account, and had a check issued

- 5 -

"for charity," after which she changed her mind about donating the money to charity and redeposited it in a new account. When the husband's attorney asked her how much money she had in the account, she said she could not recall. When he asked her whether it was less than $200,000, she said she could not recall. This was about one month after she had redeposited the proceeds of the cashier's check to an account at the credit union, shortly after which she moved it to an existing account at a bank.

When her client testified in deposition, in Respondent's presence, that she did not know whether the cashier's check was written for an amount that was less than $200,000, the testimony was false, and Respondent knew it was false. The wife's testimony that the funds had been withdrawn from the account for the purpose of making a donation to a charity was also false because, as Respondent knew, her client had never intended to use the money to fund a trust or make a charitable donation. The referee found that Respondent failed to take any action to correct her client's false testimony so as to prevent the possibility of committing a fraud on the court.

After the deposition testimony in which the wife disclosed that she had withdrawn an unspecified amount of money, but at least $100,000, from her credit union account and had a check issued "for charity," which she later redeposited, the husband's attorney scheduled a hearing on his then pending motions to compel

discovery. On the eve of the scheduled hearing date, September 20, 2011, Respondent delivered to the husband's counsel a box of documents which she said contained items responsive to his original request for production filed more than a year earlier. Then, in October, the wife signed and Respondent served a corrected financial affidavit, which disclosed that the wife's checking account balance was $437,422.04. This money was derived from the proceeds of the redeposited cashier's check, some of the money having been spent in the interim. Before he had seen the corrected financial affidavit, the husband's attorney called Respondent to ask if she could tell him the source of the interest income the wife had reported on her 2010 tax return. That same day, Respondent delivered copies of additional records, including those showing the existence of the former credit union account and the issuance of the cashier's check.

After the final judgment was entered in the dissolution case, the court allowed the former husband to visit the former marital home for the purpose of retrieving personal items that had been awarded to him as nonmarital property but not yet given to him. One item on his list of personal items was described as a "coin collection from childhood in fireproof safe in study." When he went to the home to get the item, he could not find it. The former wife, who disputed his ownership of any coins, had removed some coins from the home and given them to Respondent so the former husband would not be able to take them. Respondent

did not disclose that she had the coins until she was ordered to produce them in a postjudgment contempt proceeding. When she received the coins from her client, Respondent knew that the husband had asserted or might assert a claim to the coins or at least some of them.

## Referee's Recommendations as to Guilt

The referee recommends that Respondent be found guilty of the following rule violations: Rule Regulating the Florida Bar 3-4.3 ("The commission by a lawyer of any act that is unlawful or contrary to honesty and justice . . . may constitute a cause for discipline."); rule 4-3.3(a)(1) (a lawyer shall not knowingly make a false statement to a tribunal or fail to correct a false statement made to a tribunal) and 4-3.3(b) (a lawyer representing a client in a proceeding who knows that a person is engaging or has engaged in fraudulent conduct shall take reasonable remedial measures); rule 4-3.4(a)-(d) (a lawyer must not obstruct a party's access to evidence, conceal material that is relevant to a proceeding or counsel or assist another to do so, fabricate evidence or counsel or assist a witness to testify falsely, disobey an obligation under the rules of a tribunal, or fail to comply with a proper discovery request); rule 4-4.1 (in representing a client a lawyer shall not make a false statement to a third person or fail to disclose facts to a third person when necessary to avoid assisting in a criminal or fraudulent act); rule 4-8.4(a) ("A lawyer shall not violate or attempt to violate the Rules of

Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another."); rule 4-8.4(c) ("A lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation . . . ."); and rule 5-1.1(e)-(f) (upon receipt of property in which another person has or claims an interest, a lawyer shall treat the property as trust property and notify the claimant of receipt of the property).

## Referee's Recommendation as to Discipline

The referee recommends that Respondent be suspended from the practice of law for ninety days and that upon reinstatement she be placed on probation for two years with the conditions that she be required to attend Ethics School and a professionalism workshop. The referee also recommends that the cost of the Bar's investigation and prosecution of this matter be charged to Respondent.

## Petitions for Review

Respondent seeks review of the referee's report, challenging the referee's findings of fact, the referee's recommendations as to guilt, and the recommended discipline. Respondent argues that she should not be disciplined or, in the alternative, that the record supports only a finding of negligent misconduct justifying disciplinary measures less severe than those recommended by the referee.

The Bar has also filed a petition for review and argues that the proven misconduct calls for more severe discipline than that recommended by the referee. The Bar argues that because Respondent is guilty of misconduct involving deceit, dishonesty, or fraud that was committed knowingly, the appropriate measure of discipline is suspension from the practice of law for one year.

**ANALYSIS**

The Court's standard of review for evaluating a referee's factual findings is as follows: This Court's review of such matters is limited, and if a referee's findings of fact are supported by competent, substantial evidence in the record, this Court will not reweigh the evidence and substitute its judgment for that of the referee. See Fla. Bar v. Frederick, 756 So. 2d 79, 86 (Fla. 2000); Fla. Bar v. Jordan, 705 So. 2d 1387, 1390 (Fla. 1998). The Court has repeatedly stated that the referee's factual findings must be sufficient under the applicable rules to support the recommendations as to guilt. See Fla. Bar v. Shoureas, 913 So. 2d 554, 557-58 (Fla. 2005).

Respondent argues that the referee's findings of fact are not supported by competent, substantial evidence. With respect to the referee's findings that Respondent committed acts involving dishonesty or fraud, Respondent argues that the findings are not supported by the evidence because proof of guilt of such misconduct requires proof of wrongful intent, and the evidence failed to establish

intent on her part. This Court has recognized that finding that an attorney has engaged in dishonesty, fraud, deceit, or misrepresentation requires proof of intent as a necessary element. See, e.g., Fla. Bar v. Barley, 831 So. 2d 163, 169 (Fla. 2002); Fla. Bar v. Fredericks, 731 So. 2d 1249, 1252 (Fla. 1999). Proof of the element of intent is satisfied by showing that the attorney engaged in the conduct deliberately or knowingly. See, e.g., Fla. Bar v. Johnson, 132 So. 3d 32, 36 (Fla. 2013); Fla. Bar v. Brown, 905 So. 2d 76, 81 (Fla. 2005). As we explain below, we find the evidence is sufficient to support the referee's findings that Respondent engaged in dishonest conduct knowingly.

Respondent claims there was insufficient evidence to prove that she knew her client had not established a charitable trust with the money she withdrew from her credit union account. Lacking such knowledge, Respondent argues, she did not knowingly submit a false financial affidavit or give false answers in discovery responses on behalf of her client. Respondent argues that the record shows she did not fail to disclose the existence of the former credit union account and the cashier's check, because she referred to records pertaining to the account in her written response to the request to produce, and the records were made available to the husband's attorney. Respondent argues that the record shows that when she discovered that her client still had the check, Respondent took reasonable action to provide corrected information by filing an updated financial affidavit. Respondent

- 11 -

also states that the evidence shows she took steps to correct the inaccurate information her client provided in her deposition. Respondent also argues that the record fails to show she knew the husband had a claim to the coins she accepted from her client.

**The Financial Affidavit and the Interrogatory Answers**

About six months before the dissolution of marriage action was filed, Respondent had provided legal advice to the wife concerning her will. The wife told Respondent about her credit union account containing over $480,000. The wife thought of the account as her separate property and told Respondent she did not want her husband to receive any part of her estate. Respondent testified that she advised the wife that by law a spouse is entitled to a share of a deceased person's estate, so she would not be able to completely bar her husband from receiving any part of her estate upon her death. Respondent testified that the wife initially wanted to make her sister the beneficiary of her estate, and Respondent advised her she needed an alternate beneficiary also because if her sister predeceased her, her estate would go to her husband. They discussed various charities the wife might designate as alternate beneficiary. Respondent told the wife about a friend of hers who owned a company that published books that were used in classes intended to teach parents effective child-rearing methods. The company that published the books was a for-profit enterprise, but Respondent

- 12 -

suggested the owner might be interested in establishing a nonprofit organization to support the cause of promoting training in effective parenting techniques for the prevention of child abuse.

Respondent testified that when the wife consulted her about the dissolution of marriage action, Respondent advised her that the money she had in her credit union account, or most of it, would probably be deemed a marital asset subject to equitable distribution. According to Respondent's testimony, when the wife insisted that she did not want her husband to receive any of the money, Respondent advised her that if she donated the money to charity, the transaction would have to be disclosed and would be deemed a dissipation of assets, resulting in a setoff in the final distribution of marital assets. Nevertheless, the wife said she wanted to donate the money to the parenting education group Respondent had told her about previously.

When Respondent advised the wife about her will, Respondent did not know whether her friend's company had an affiliated nonprofit support organization. However, by the time Respondent was retained to represent the wife in the dissolution proceeding, she had learned not only that there was no such nonprofit organization in existence, but also that due to a decline in the business, her friend had decided to seek other employment and was not interested in forming a nonprofit organization related to improving parenting or preventing child abuse.

On questioning by her own counsel in the referee proceeding, Respondent testified as follows:

> Q. Okay. Now, this Parenting Education Charitable Trust, which is the payee on this $480,000 check, did you provide that name to her, that entity?
>
> A. When I told her, [my friend] didn't have any sort of charitable arm set up and something would have to be set up. [My friend] would prefer it to be a charitable trust because she didn't want the ongoing administrative expenses that were associated with a 501(c)(3) corporation. [The wife] asked me, well, how would a donation check be made out? I said, it would be made out to the name of the trust. And she asked me, well, how would the trust be named? I said, whatever you want to name it. You're creating it, so it's up to you what you want to name it. And I think she asked me if the name Parenting Education Charitable Trust would be okay, and I said yes.

Respondent testified that she told the wife that she, Respondent, was not qualified to advise her on setting up a charitable trust and she would need to consult other counsel to provide her that service.

The former wife's testimony differed from Respondent's. The former wife testified that Respondent told her the name of the payee to whom she should have the cashier's check written. The former wife testified that she believed Parenting Education Charitable Trust was an entity that had been or was in the process of being established, that Respondent was going to research the issues as necessary, and that other lawyers in her law firm would be able to perform the necessary legal work to establish the charitable entity.

- 14 -

When asked why the cashier's check was not reported as an asset in the wife's initial family law financial affidavit, Respondent testified that when the wife gave her a worksheet she had prepared for the affidavit, and the money represented by the cashier's check was not listed, Respondent "thought the reason was because she gave it to the charity that she'd set up." The former wife, on the other hand, testified that she assumed Respondent or other lawyers in the law firm were working on setting up the trust. Respondent testified that she did not become aware that the wife had not funded a trust until the following August. Respondent claims that when she found out the wife still had the cashier's check, she advised her to redeposit it in a bank account so that the funds could be disclosed by means of an updated financial affidavit, which was filed in October 2011, before the case went to trial. The trial of the dissolution case was held October 24-26, 2011. Thus Respondent claims she corrected the faulty financial information within a reasonable time after learning of the inaccuracy.

Respondent's denial of the allegations of misconduct in connection with her disclosures to the court and in discovery on behalf of the wife depends on her claim that she assumed the wife had established a charitable trust and transferred the check in the amount of $482,980.46 to the trust. However, Respondent never heard any report back from anyone that a charitable trust had been established and funded with her client's money. From the day the check was issued until the day it

was redeposited—a period of nearly a year—so far as the record shows Respondent and her client never discussed the progress being made toward the establishment of a trust. In order to know that the disclosures and discovery responses submitted on behalf of the wife were accurate, Respondent would have had to confirm that the wife had actually divested herself of the money. According to Respondent, she did not confirm it; she assumed it.

Even if Respondent initially believed the wife's financial affidavit was accurate because she had given away the money, the evidence supports the referee's conclusion: "As the dissolution proceedings continued, neither Respondent nor [the former wife] could have believed that the check would be used for charitable purposes." Although Respondent testified that she did not become aware that her client still had the check until August 2011, the referee implicitly concluded from the evidence that this knowledge must have come much earlier. If Respondent was not aware of the inaccuracy of her discovery responses when they were served, under Family Law Rule of Procedure 12.280, General Provisions Governing Discovery, she was obligated to amend the responses when she became aware that the responses were incorrect or had become incorrect in light of new information. The referee found Respondent never did this and that the failure to do so clearly shows intentional misconduct.

Although there were conflicts in the evidence, the referee heard the testimony and resolved the conflicts. The responsibility for finding facts and resolving conflicts in the evidence is placed with the referee. See Fla. Bar v. Hooper, 509 So. 2d 289, 290 (Fla. 1987). The referee is in the best position to judge the credibility of witnesses. See Fla. Bar v. Forrester, 916 So. 2d 647, 652 (Fla. 2005); Fredericks, 731 So. 2d at 1251. A party seeking to show that a referee's findings of fact are not supported by competent, substantial evidence cannot do so simply by pointing to contradictory evidence in the record. See Fla. Bar v. Committe, 916 So. 2d 741, 746 (Fla. 2005). We find that competent, substantial evidence in the record supports the referee's factual findings with respect to Respondent's knowledge of the cashier's check, the falsity of the financial affidavit filed with the court, and the incomplete, false, or misleading interrogatory answers provided to opposing counsel.

Based on her conduct with respect to the wife's financial affidavit and the discovery answers, the referee recommended that Respondent be found guilty of the following rule violations: (1) rule 3-4.3 (unlawful and dishonest acts are a cause for discipline), based on the filing of the inaccurate financial affidavit and not disclosing the existence of the cashier's check; (2) rule 4-3.3(a) (making or failing to correct a false statement of material fact made to a tribunal), based on the filing of the false financial affidavit; (3) rule 4-3.4(b) (a lawyer must not fabricate

- 17 -

evidence), based on the submission of the false financial affidavit; (4) rule 4-4.1 (making a false statement or failing to disclose a material fact), based on the false financial affidavit and nondisclosure of the cashier's check; and (5) rule 4-8.4(a) and (c) (a lawyer shall not violate the Rules of Professional Conduct or do so through the acts of another and shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation), based on the filing of the affidavit and the nondisclosure discussed in connection with the other violations. As stated above, the factual findings must support the recommendations as to guilt. We find that the referee's findings of fact support these recommendations as to guilt.

### Response to Husband's Request for Production

Respondent argues that there was no failure to disclose the cashier's check as a financial asset because her written response to the husband's request to produce made reference to the credit union account from which the cashier's check was issued and stated that the records were "available for inspection and copying at the office of the undersigned." Respondent argues that the husband's attorney did not inspect the documents because of his own lack of diligence. However, the request to produce filed by the husband's attorney specified that production of documents should be made at his office. The referee found that Respondent did not object or seek a protective order with respect to the terms of the discovery.

Although the husband's request to produce specified the husband's attorney's office as the place of production, Respondent testified that her paralegal "tried to find out how they could coordinate the discovery but she wasn't getting any answers from [opposing counsel] or his office." The husband's attorney testified that from December 2010, when his first motion to compel was granted, until September 2011, Respondent delayed the production of the documents he sought by his request to produce. He testified that he offered numerous times to pick up the documents, scan them at his office, and bring them back the same day, but his offers were refused. The husband's attorney wanted to examine the documents at his office so he could decide which ones he needed to copy or scan and he preferred to scan the needed items at his office so he would have them in digital format.

Respondent testified that her law firm had a policy of not providing documents in discovery without payment of copying costs by opposing counsel. A paralegal who worked with Respondent testified that the documents were not produced because the husband's attorney refused to pay the copying costs. She said that she offered to send the documents to a copy service to have the documents copied or scanned at his expense, but the husband's attorney refused the offer. Attempting to explain why her firm would not allow the records to be

delivered to the husband's attorney for him to inspect, copy, or scan selected items

as he chose and then bring them back, the paralegal testified as follows:

> So, it went back and forth several times, but he wanted somebody to deliver them to his office and sit at the office and let him go through and pick out what he wanted and copy them. Because we weren't gonna drop the box of documents off because those were all our original documents and we had not scanned them in or catalogued them or Bates stamped them, you know, to know what—everything that's in there, so we weren't just gonna drop the box of documents off and let him go through and copy them.

This testimony does not justify the failure to produce the documents.

Florida Rule of Civil Procedure 1.350 governs "Production of Documents

and Things" and provides that a party may request another party "to produce and

permit the party making the request . . . to inspect and copy any designated

documents." Rule 1.350(b) provides that a request to produce "shall specify a

reasonable time, place, and manner of making the inspection" and requires the

party to whom the request is directed to respond either stating that the inspection

will be permitted as requested or stating an objection. See also Fla. Fam. L. R. P.

12.285(*l*) ("Unless otherwise agreed by the parties or ordered by the court, all

production required by this rule shall take place . . . in the office of the attorney for

the party receiving production."). The referee found that Respondent never

objected to the husband's request to produce. The husband's request for

production did not require Respondent to incur any copying costs. There was no

testimony that Respondent had any reason to believe the husband's attorney could

not be trusted to inspect the original documents and return them in proper order. While the paralegal described her reluctance to turn over documents without knowing, in the paralegal's words, "everything that's in there," the obvious solution would be to catalogue the documents and to know what they are before producing them for inspection. A party's objections to the time, place, or manner of production should be made to the court. See Fla. R. Civ. Pro. 1.280(c) (General Provisions Governing Discovery; Protective Orders). The referee found that the dispute about paying for copies "may have resulted in some delay but certainly this was not the major reason for the delay in responding to [the husband's attorney's] requests."

Respondent also argues that if she violated the rules of discovery, the violation was inconsequential because ultimately all the wife's financial information was disclosed before the trial. However, concealing a document even temporarily, and even when the information may be available to opposing counsel by other means or from other sources, has been held to be misconduct. See Fla. Bar v. Forrester, 818 So. 2d 477, 481-82 (Fla. 2002). Respondent's claim that there was no concealment of financial information because the bank records were in a box of documents which opposing counsel could have inspected at her office does not justify her failure to comply with the rules of discovery. We find that competent, substantial evidence in the record supports the factual finding of the

referee that Respondent deliberately withheld documents requested in the husband's request to produce. This factual finding supports the referee's recommended finding as to Respondent's guilt of violating rule 4-3.4(a) (concealing or obstructing the opposing party's access to evidence) and rule 4-3.4(c)-(d) (disobeying the rules of the tribunal and failure to produce records or documents in response to discovery).

### The Wife's Deposition Testimony

Respondent argues that the referee erred in finding that she knowingly allowed false evidence to be presented by way of the wife's deposition testimony about the withdrawal and redeposit of the funds in the credit union account without taking any remedial action. The referee found that the wife's September 2011 deposition testimony that she had the cashier's check issued to make a donation to charity, did not know the amount of the cashier's check, and did not know whether the balance in the account from which she withdrew the money was more or less than $200,000 was false. The wife's testimony was that after she withdrew the money in the form of a cashier's check, it was not her money since it was going to charity; therefore she did not need to include it in her financial affidavit. When she later changed her mind about donating the money to charity, it meant merely that her financial affidavit needed to be "updated." The referee concluded that

Respondent knew the wife's deposition testimony was false but took no remedial action.

The referee's recommended findings of misconduct for violating rule 4-3.3, Candor Toward the Tribunal, subdivision (a)(1) and (b), are based partly on Respondent's failure to correct the inaccurate financial affidavit as discussed above and partly on her failure to correct "the false evasive testimony" of the wife at her deposition. Rule 4-3.3(a)(1) provides: "A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." Rule 4-3.3(b) provides:

> A lawyer who represents a client in an adjudicative proceeding and who knows that a person intends to engage, is engaging, or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.

Furthermore, rule 4-3.3 "applies when the lawyer is representing a client in an ancillary proceeding conducted pursuant to the tribunal's adjudicative authority, such as a deposition." R. Regulating Fla. Bar 4-3.3 cmt.[1]

---

1. The comment to rule 4-3.3 also includes the following statement: "The prohibition against offering false evidence only applies if the lawyer knows that the evidence is false. A lawyer's reasonable belief that evidence is false does not preclude its presentation to the trier of fact." This comment does not apply here because, as the referee found, Respondent knew the testimony was false. We are also not concerned here with issues that sometimes arise in criminal cases in circumstances where a lawyer's duty of candor to the tribunal must be "balanced

The comment to rule 4-3.3 recognizes that in certain circumstances the rule may put the attorney in the difficult position of betraying the confidence of his or her client:

> The rule generally recognized is that, if necessary to rectify the situation, an advocate must disclose the existence of the client's deception to the court. Such a disclosure can result in grave consequences to the client, including not only a sense of betrayal but also loss of the case and perhaps a prosecution for perjury. But the alternative is that the lawyer cooperate in deceiving the court, thereby subverting the truth-finding process that the adversary system is designed to implement.

The comment also illustrates the rule's requirement of "reasonable remedial measures" as follows: "If perjured testimony or false evidence has been offered, the advocate's proper course ordinarily is to remonstrate with the client if circumstances permit. In any case, the advocate should ensure disclosure is made to the court."

Respondent suggests that the wife was not deliberately lying but was confused due to badgering by the husband's attorney. Respondent also argues that she took reasonable steps to remedy the effect of the wife's inaccurate deposition testimony. Respondent argues that if she had interrupted the wife in the middle of the deposition to counsel her about her testimony, she would have been accused of

---

with competing obligations." United States v. Stewart, 931 F. Supp. 2d 1199, 1215 (S.D. Fla. 2013).

coaching the witness, so she waited until a break in the deposition to inform the husband's attorney that accurate information about the amount of money in the account could be obtained by examining the records she had referred to in her response to his request to produce—records which she had "made available" to him but had not yet actually provided to him.

Respondent's assumption that any interruption would have been objected to is speculative. We do not know what opposing counsel would have done if Respondent had asked for a suspension of questioning so she could counsel her client because, as far as the transcript shows, she never asked. The referee found that the husband's attorney did not remember Respondent acknowledging the inaccuracy of the wife's testimony and telling him where he could find the correct figures as Respondent claimed. The transcript of the deposition does not show any such correction or clarification on the record. Thus there was a conflict between Respondent's testimony and that of the husband's attorney. Resolving conflicts in the evidence is the responsibility of the referee. See Hooper, 509 So. 2d at 290. The referee resolved this factual issue by finding that Respondent failed to take reasonable remedial steps to rectify the effect of false deposition testimony, knowing of its falsity. On review of the record we conclude that the referee's findings that the wife's deposition testimony was false and that Respondent knew

it was false and took no reasonable remedial action are supported by competent, substantial evidence.

Respondent argues that the opposing party and the court had accurate financial information by the time of the trial and that the record shows no intent to mislead or deceive the court. In the aftermath of the September 2011 deposition, the requested documents were finally produced and accurate financial information was provided. The circuit court proceeded to render a final judgment and distribute the parties' assets. The Bar responds that Respondent should not be credited for her delayed compliance with her disclosure obligations, because after the deposition of the wife, it was inevitable that the deception would be uncovered, and Respondent had no choice but to provide accurate financial information. Regardless of the lack of effect on the ultimate outcome, the referee found that Respondent knowingly withheld accurate information from opposing counsel and the court by failing to take action to correct the inaccurate testimony at the deposition. This finding is supported by competent, substantial evidence. The referee's finding, in turn, supports the recommendations as to Respondent's guilt of violating rule 4-3.3(a)(1) and (b) (failing to take remedial action to correct the false deposition testimony) and rule 4-3.4(b) (assisting in the giving of false testimony).

**Respondent's Receipt of the Coins**

Respondent challenges the referee's findings of fact and recommended finding as to misconduct in connection with her taking possession of the coins given to her by the wife. Respondent claims there is insufficient evidence to support the conclusion that she violated rule 5-1.1(e)-(f) by receiving property in trust without notice to a party claiming an interest in the property. Respondent claims she believed the coins the wife gave her were her client's property and she had no reason to believe the husband had a claim to those coins.

There was conflicting evidence concerning the coins. An exhibit admitted into evidence by the referee, which had also been an exhibit admitted into evidence in the circuit court dissolution case, was the "List of Husband's Personal Property." Item 9 on the list was "coin collection from childhood in fireproof safe in study." The final judgment in the dissolution case awarded both parties their claimed personal property as submitted to the court in their respective lists. The former husband testified that he had about a dozen old silver dollars and that when he was allowed by court order to visit the former marital home to collect the personal property that had been awarded to him but which he had not yet received, he could not find the coins. He asked the former wife where they were and, according to his testimony, she replied, "I have them in safekeeping." Respondent was present during this visit, heard the conversation, and said nothing.

The former wife testified that during the dissolution trial she gave some coins to Respondent for safekeeping because she was afraid her former husband might try to take them. She said she inherited the coins from her mother and she had claimed them as her separate property in the dissolution case. She testified that her former husband did not own any coins and the coins that were present in the marital home were hers.

In her testimony before the referee, Respondent admitted that during the dissolution trial she received some coins from her client because the wife was afraid the husband would try to take them. Respondent testified that she believed the coins she received were the separate property of the wife. Respondent testified that to the extent of her knowledge, the former husband did not have a coin collection and that she did not disclose her possession of the coins because she did not know the husband had asserted a claim to the coins she had taken possession of. The dissolution court ultimately divided the coins between the parties.

Respondent acknowledged that the reason the wife wanted her to take the coins was that the husband might try to take them. That fact alone was enough to alert Respondent that there might be a dispute as to the ownership of the coins, whether the husband's claim was meritorious or not. But even if, at the time she received them, Respondent was not aware that the husband claimed ownership of the coins the wife entrusted to her for safekeeping, she certainly became aware that

there was a dispute as to the ownership of the coins when the former husband visited the home, looked for some coins, and could not find them. At that point, if not earlier, Respondent had a duty to disclose her custody of the coins. Therefore, even though ownership was disputed by her client, Respondent had a clear duty to notify opposing counsel that she had received and had custody of the coins. She did not do so until she was ordered to in connection with a postjudgment contempt proceeding. The referee's findings of fact represent a resolution of conflicting evidence. The mere showing that there is conflicting evidence in the record is not sufficient to overcome the presumption of correctness that applies to the referee's findings of fact. See Committe, 916 So. 2d at 746; Fla. Bar v. Barrett, 897 So. 2d 1269, 1275 (Fla. 2005). The findings of fact are supported by competent, substantial evidence in the record. Moreover, the findings of fact support the recommendation of guilt of misconduct for violation of rule 5-1.1(e)-(f) (failure to give notice of receipt of property held in trust).

## DISCIPLINE

The referee recommended that Respondent be suspended from the practice of law for ninety days and be placed on probation for two years. The referee observed that a more severe discipline might be deemed appropriate to the nature of the misconduct, but found as mitigating factors that Respondent had an unblemished record and a good professional reputation. Respondent seeks review

- 29 -

of the referee's recommendation on discipline. She argues that the discipline is too severe because her only misconduct, if any, was that she failed to respond quickly or thoroughly enough to rectify the situation when she discovered that the wife's financial disclosures were not accurate. She argues that since her misconduct was negligent and not intentional, she should not be suspended but only reprimanded. We have already rejected Respondent's claim that the evidence was insufficient to prove intent under the applicable standard for finding that element. We therefore reject Respondent's argument on the question of discipline.

The Bar argues that the referee's recommended discipline is inadequate in light of the proven misconduct. In reviewing a referee's recommended discipline, this Court's scope of review is broader than that afforded to the referee's findings of fact because, ultimately, it is our responsibility to order the appropriate sanction. See Fla. Bar v. Anderson, 538 So. 2d 852, 854 (Fla. 1989); see also art. V, § 15, Fla. Const. However, generally speaking, this Court will not second-guess the referee's recommended discipline as long as it has a reasonable basis in existing caselaw and the Florida Standards for Imposing Lawyer Sanctions. See Fla. Bar v. Temmer, 753 So. 2d 555, 558 (Fla. 1999).

The purposes of attorney discipline are: (1) to protect the public from unethical conduct without undue harshness towards the attorney; (2) to punish misconduct while encouraging reformation and rehabilitation; and (3) to deter

other lawyers from engaging in similar misconduct. See <u>Fla. Bar v. Maynard</u>, 672 So. 2d 530, 540 (Fla. 1996); <u>Fla. Bar v. Neu</u>, 597 So. 2d 266, 269 (Fla. 1992); <u>Fla. Bar v. Lord</u>, 433 So. 2d 983, 986 (Fla. 1983).

Florida Standard for Imposing Lawyer Sanctions 6.1, False Statements, Fraud, and Misrepresentation, and Standard 6.2, Abuse of the Legal Process, provide guidance for determining the sanction in this case. Standard 6.1 applies to "conduct that is prejudicial to the administration of justice or that involves dishonesty, fraud, deceit, or misrepresentation to a court." Under standard 6.1, specific standard 6.12 provides: "Suspension is appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action." Standard 6.2 applies to "failure to obey any obligation under the rules of a tribunal." Under standard 6.2, specific standard 6.22 provides: "Suspension is appropriate when a lawyer knowingly violates a court order or rule, and causes injury or potential injury to a client or a party, or causes interference or potential interference with a legal proceeding." Under these standards, a suspension is appropriate.

Because the standards do not distinguish among suspensions of differing length, they are helpful only as a starting point. See <u>Fla. Bar v. Walton</u>, 952 So. 2d 510, 514 (Fla. 2006); <u>Brown</u>, 905 So. 2d at 83-84. We also look to the caselaw and compare the facts and circumstances of the case under review with previous

disciplinary cases in which similar misconduct occurred under comparable circumstances.  See, e.g., Fla. Bar v. Erlenbach, 138 So. 3d 369, 373-74 (Fla. 2014); Fla. Bar v. Breed, 378 So. 2d 783, 785 (Fla. 1979).

In Florida Bar v. Miller, 863 So. 2d 231, 233-34 (Fla. 2003), the respondent was found to have concealed his awareness of a document, submitted false statements as to his awareness of the document, and permitted witnesses to testify in ways that created false impressions as to their awareness of the document.  The Court imposed a one-year suspension.  Id. at 236.  In Florida Bar v. Cox, 794 So. 2d 1278, 1279-80 (Fla. 2001), a prosecuting attorney was found to have knowingly concealed information from the court and from the defendant which would have been important information for the defendant to have in preparation for trial.  The Court observed that based on the applicable precedents, any attempt to withhold the truth or present false information in a court proceeding would normally merit disbarment.  Id. at 1284-85.  However, based on mitigating factors found by the referee, including the respondent's lack of a prior disciplinary record, the Court imposed a suspension of one year.  Id. at 1286-87.  Other cases show that intentional misrepresentation to a court is regarded as serious misconduct which usually results at minimum in a suspension requiring proof of rehabilitation for reinstatement.  See, e.g., Fla. Bar v. Head, 84 So. 3d 292, 303 (Fla. 2012); Fla. Bar

v. Head, 27 So. 3d 1, 9-10 (Fla. 2010); Fla. Bar v. Hmielewski, 702 So. 2d 218, 219-21 (Fla. 1997); Fla. Bar v. Jasperson, 625 So. 2d 459, 463 (Fla. 1993).

Based on the referee's findings of fact and recommendations as to guilt, considered in light of the lawyer sanction standards and disciplinary caselaw discussed above, we find that the appropriate measure of discipline in this case is suspension from the practice of law for one year.

## CONCLUSION

Accordingly, Respondent is hereby suspended from the practice of law for one year. The suspension will be effective thirty days from the date of this opinion so that Respondent can close out her practice and protect the interests of existing clients. If Respondent notifies this Court in writing that she is no longer practicing and does not need thirty days to protect existing clients, this Court will enter an order making the suspension effective immediately. Respondent shall accept no new business from the date this opinion is filed until such time as she is reinstated to the practice of law by order of this Court. Respondent is required to comply with Rule Regulating the Florida Bar 3-5.1(h).

Judgment is entered for The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida 32399-2300, for recovery of costs from Zana Holley Dupee in the amount of $9,009.33, for which sum let execution issue.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and PERRY, JJ., concur.

THE FILING OF A MOTION FOR REHEARING SHALL NOT ALTER THE EFFECTIVE DATE OF THIS SUSPENSION.

Original Proceeding – The Florida Bar

John F. Harkness, Jr., Executive Director, The Florida Bar, Tallahassee, Florida; Adria E. Quintela, Staff Counsel, The Florida Bar, Sunrise, Florida; and James N. Watson, Jr., Bar Counsel, The Florida Bar, Tallahassee, Florida,

for Complainant

David Robert Ristoff of Williams, Ristoff & Proper, P.L.C., New Port Richey, Florida,

for Respondent